1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

ROMESH SOIN and ALMA SOIN,          NO. CIV. 2:12-634 WBS EFB

          Plaintiffs,

                                     MEMORANDUM AND ORDER RE:
     v.                              MOTION FOR PRELIMINARY
                                     INJUNCTION
FEDERAL NATIONAL MORTGAGE
ASSOCIATION a/k/a FANNIE MAE;
SUNTRUST MORTGAGE, INC.; and
DOES 1-100 inclusive,

          Defendants.
_____/


                    ----oo0oo----


          Plaintiffs Romesh Soin and Alma Soin filed a state

action against defendants Federal National Mortgage Association

("Fannie Mae") and Suntrust Mortgage, Inc. ("Suntrust") bringing

claims arising from allegedly wrongful conduct related to a loan

modification application under the Home Affordable Modification

Program ("HAMP").  Currently before the court is plaintiffs'

motion for preliminary injunction.  (Docket No. 16.)

                              1

I.   <u>Procedural and Factual Background</u>

          According to plaintiffs, they are the owners of real property located at 9251 Bright Stars Court in Elk Grove, California ("Subject Property").  (Not. of Removal Ex. 1 ("Compl.") ¶ 1 (Docket No. 1).)  On or about October 19, 2007, plaintiff obtained a loan from Suntrust in the amount of $250,000, which was secured by the Subject Property.  (<u>Id.</u> ¶ 8, Ex. 1.)  The Complaint states that, "at some unknown point after the close of escrow, the beneficial rights to the Subject Loan were purportedly transferred to FANNIE MAE."  (<u>Id.</u> ¶ 9.)

          After plaintiffs allegedly began to experience financial difficulties, they submitted a loan modification application to Suntrust.  (<u>Id.</u> ¶ 10.)  In December 2009, Suntrust issued plaintiffs a Home Affordable Modification Program ("HAMP") Loan Trial Period Plan ("TPP").[1]  (<u>Id.</u> ¶ 11, Ex. 2.)  Under the TPP, plaintiffs agreed to make four monthly payments of $1,088.28 instead of their usual monthly payments and to provide Suntrust with various documents and personal information.  (<u>Id.</u> ¶ 12, Ex. 2 §§ 1, 2, 4.)

          The TPP states that

          If [plaintiffs] are in compliance with this Trial
          Period Plan . . . and [plaintiffs'] representations in
          Section 1 continue to be true in all material respects,
          then [Suntrust] will provide [plaintiffs] with a Home
          Affordable Modification Agreement . . ., as set forth
          in Section 3, that would amend and supplement (1) the
          Mortgage on the Property, and (2) the Note secured by
          the Mortgage.

_____

     [1]   A copy of this document was attached to plaintiffs'
Complaint as Exhibit 2.  As no party disputes the authenticity of
this document, the court will take judicial notice of it.  <u>See</u> <u>In</u>
<u>re Silicon Graphics Inc. Sec. Litig.</u>, 183 F.3d 970, 986 (9th Cir.
1999).

1  (<u>Id.</u> Ex. 2 at 1.)  In section three, the TPP further cautions

2  that it is not a modification of plaintiffs' loan documents and

3  that modification is contingent upon plaintiffs' submission of

4  all required documents and information and Suntrust's

5  determination that plaintiffs qualify for a modification.  (<u>Id.</u>

6  Ex. 2 § 3.)  The TPP also clearly states that if Suntrust does

7  not provide plaintiffs with a fully executed copy of the TPP and

8  a modification agreement, no permanent modification will occur.

9  (<u>Id.</u> Ex. 2 § 2(G).)

10       Plaintiffs claim that they met their obligations

11  pursuant to the TPP in that (1) they "were and remained unable to

12  afford their mortgage for the reasons indicated on the hardship

13  affidavit submitted during the modification application process,"

14  (2) they "continued to reside in the Subject Property as their

15  principal residence," (3) they "provided documentation of all

16  their income," (4) they "were not required to obtain credit

17  counseling," (5) they "complied with Section 2 by making four

18  monthly payments in the amount of $1,088.28," and (6) "there was

19  no change in the ownership of the Subject Property."  (<u>Id.</u> ¶ 13.)

20  Nowhere do plaintiffs allege that Suntrust determined that they

21  qualified for a loan modification, as required under section 3 of

22  the TPP, or that they should have been determined to be qualified

23  for a loan modification.  (<u>See</u> <u>id.</u> Ex. 2, §3.)

24       According to plaintiffs, after making their fourth

25  modified monthly payment in April 2010, they contacted Suntrust

26  to learn the status of their application for a permanent

27  modification.  (<u>Id.</u> ¶ 14.)  Suntrust allegedly told them that

28  "the permanent modification paperwork would be forthcoming" and

that, until then, they should continue making modified payments.
(Id.)  For the next eighteen months, plaintiffs claim that every
month they made a modified payment and inquired about their
permanent modification application.  (Id. ¶ 15.)  Plaintiffs
further claim that each month, Suntrust again indicated that
permanent modification paperwork was forthcoming and that they
should continue making modified payments.  (Id.)

        On January 3, 2011, and again on January 6, 2011,
according to the declaration of Fannie Mae loan negotiator Edward
Hamway, Suntrust mailed letters to plaintiffs advising them that,
due to missing updated documentation, Suntrust would not approve
their loan modification.  (Hamway Decl. ¶¶ 7, 8 (Docket No. 17-
1).)  According to Mr. Hamway, a similar letter was sent a third
time in November 2011.  (Id. ¶ 9.)

        On November 7, 2011, Suntrust caused a notice of
Default to be recorded against the Subject Property.  (Compl. ¶
16, Ex. 3.)  Although plaintiffs attempted to make five
additional modified monthly payments after receiving the Notice
of Default, Suntrust returned these payments to them.  (Id. ¶ 17;
see also Am. Soin Decl. ¶¶ 32-36 (Docket No. 19).)[2]  According to
plaintiffs, when they contacted Suntrust, they were informed that
Suntrust and Fannie Mae were not offering them a permanent
modification and that they would need to reapply for a loan
modification, which they immediately did.  (Compl. ¶¶ 17, 18.)
Plaintiffs allege that with respect to the second loan

        [2]   Defendants have submitted three objections to portions
of Mr. Soin's declaration.  (Docket No. 18.)  Because the court's
holding does not rely on any of the objected to evidence,
defendants' objections are dismissed as moot.

4

modification application, they submitted all supporting documentation and "immediately complied" with Suntrust's requests for additional documentation. (Id. ¶ 18.) Plaintiffs also submit the declaration of Mr. Soin that "[o]n December 28, 2011, [he] faxed all requested documents as per requested [sic] to SUNTRUST MORTGAGE." (Am. Soin Decl. ¶ 31.)

On February 8, 2012, plaintiffs discovered that Suntrust had caused a second Notice of Default to be recorded. (Compl. ¶ 19, Ex. 4.) Plaintiffs allege that this occurred before they were told whether their second application for a loan modification had been accepted or denied. (Id. ¶ 19.) After learning of the second Notice of Default, plaintiffs contacted Suntrust and were allegedly informed that their second application was being denied because they had failed to provide all requested documentation. (Id. ¶ 20.) Plaintiffs claim that this was a false statement. (Id. ¶¶ 18, 20.)

In their Complaint, plaintiffs assert causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. (Docket No. 1.)

Defendant Suntrust removed the case to federal court on March 13, 2012. (Id.) Plaintiffs filed a motion for a temporary restraining order on March 20, 2012, alleging that the Subject Property faced foreclosure on March 21, 2012. (Docket No. 8.) The court granted plaintiffs' motion on March 21, 2012. (Docket No. 15.)

II. <u>Discussion</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  As the Supreme Court has repeatedly recognized, injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (quoting 11A Wright, Miller & Kane, Federal Practice and Procedure § 2948, at 129-30 (2d ed. 1995)); see Winter, 555 U.S. at 22.

After Winter, the Ninth Circuit has held that a preliminary injunction may be appropriate where a plaintiff demonstrates "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided that the plaintiffs also satisfy the other two Winter factors (public interest and irreparable harm). Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

A.    Likelihood of Success on the Merits

In their motion for a preliminary injunction, plaintiffs discuss only the likelihood of success on their breach of contract claim, which is based on the argument that defendants breached the Home Affordable Modification Trial Period Plan ("TPP") offered to plaintiffs by not offering them a permanent loan modification.  Accordingly, the court will not address plaintiffs' remaining two claims.

6

To recover on a claim for breach of contract, a plaintiff must first show the existence of a valid contract. First Commercial Mortg. Co. v. Reece, 89 Cal. App. 4th 731, 745 (2d Dist. 2001).  Here, plaintiffs attempt to characterize the TPP as a contract entered into by the parties that defendants then breached.  Under the TPP, plaintiffs agreed to pay four months of trial period payments while defendants determined whether plaintiffs qualified for a permanent modification of their loan.  (Compl. Ex. 2.)  The TPP, however, clearly states that it is not a modification of plaintiffs' loan documents and that modification is contingent upon a determination that plaintiffs qualify for a modification.  (Id. Ex. 2 at Sec. 3.) It also clearly states that if Suntrust does not determine that plaintiffs are qualified and does not provide plaintiffs with a fully executed copy of the TPP and a modification agreement, no permanent modification will occur.  (Id. Ex. 2 at Sec. 2(G).) While plaintiffs claim that they made trial payments and provided requested documentation to defendants under the TPP, they do not allege that Suntrust ever determined that they were qualified to receive a permanent modification or that they ever received a fully executed copy of the TPP or modification agreement.

Many district courts have held that TPPs such as the one at issue here do not constitute binding contracts to permanently modify loans.  See, e.g., Lucia v. Wells Fargo Bank, N.A., 798 F. Supp. 2d 1059, 1069 (N.D. Cal. 2011) (dismissing with prejudice claims for breach of contract where plaintiffs alleged defendant had breached TPP by failing to offer permanent HAMP modifications at the close of the trial period); Grill v.

BAC Home Loans Servicing LP, No. Civ. 2:10-03057 FCD, 2011 WL
127891, at *3-4 (E.D. Cal. Jan. 14, 2011) (Damrell, J.) (holding
that plaintiffs had not stated a breach of contract claim based
on a TPP because "no binding contract ha[d] been alleged"); Nadan
v. Homesales, Inc., No. Civ. 1:11-1181 LJO, 2011 WL 3584213, at
*6-7 (E.D. Cal. Aug. 12, 2011) (O'Neill, J.) (dismissing breach
of contract claims based on TPP with prejudice); Vida v. OneWest
Bank F.S.B., Civ. No. 10-987-AC, 2010 WL 5148473, at *6 (D. Or.
Dec. 13, 2010) ("The Trial Period Plan is explicitly not an
enforceable offer for loan modification.").  The same conclusion
was recently reached by a California Court of Appeal, which held
that "[a]s a matter of law, there was no contract" where the
defendant had offered the plaintiffs a TPP, but never had
prepared or executed a permanent modification agreement.
Nungaray v. Litton Loan Servicing, LP, 200 Cal. App. 4th 1499,
1504 (2d Dist. 2011).

        Notably, two other judges of this court have held that
TPPs are not binding contracts for permanent loan modifications.
In Nadan, Judge O'Neill held that a TPP was not a valid contract
both because it lacked consideration and because the TPP was an
"unenforceable 'agreement to agree'" given that material terms of
the purported permanent modification were not specified.  Nadan,
2011 WL 3584213, at *6.  In Grill, Judge Damrell relied on
language in the TPP stating that modification was contingent upon
a determination that the plaintiff met applicable requirements
and receipt and execution of a permanent loan modification
agreement to hold that no contract had been alleged where the
plaintiffs, like plaintiffs here, did not allege that those

1   events had occurred.  <u>Grill</u>, 2011 WL 127891, at *4.

2          In an attempt to challenge this Eastern District of

3   California precedent, plaintiffs have cited only three cases in

4   which trial courts outside this district held that a plaintiff

5   could state a claim for breach of contract based on a TPP or

6   other trial period agreement.  None, however, are persuasive.

7   First, in <u>Ansanelli v. JP Morgan Chase Bank, N.A.</u>, No. C 10-3892,

8   2011 WL 1134451 (N.D. Cal. Mar. 28, 2011), the court considered

9   not whether a TPP such as the one involved here was a valid

10  contract, but whether an oral agreement regarding a trial period

11  was a valid modification of the plaintiffs' loan agreement.  <u>Id.</u>

12  at *3-5.

13         Second, <u>Turbeville v. JP Morgan Chase Bank</u>, No. SA CV

14  10-1464, 2011 WL 7163111 (C.D. Cal. Apr. 4, 2011), was a

15  purported class action lawsuit in which the court held that the

16  plaintiffs' submission of documentation supplied the necessary

17  consideration to form a valid contract.  However, as pointed out

18  in <u>Senter v. JP Morgan Chase Bank, N.A.</u>, 810 F. Supp. 2d 1339

19  (S.D. Fla. 2011), the court in <u>Turbeville</u> failed to consider

20  language in section three of the TPP cautioning that plaintiffs

21  would not be given a permanent modification until the lender

22  determined that they qualified and sent them a permanent

23  modification agreement for signature and, in relying on the

24  submission of financial information to show consideration, failed

25  to "distinguish between conditions for application and

26  consideration for an agreement."  <u>Id.</u> at 1349, 1356.  The latter

27  point is a distinction recognized by Judge Damrell in <u>Grill</u>.

28  <u>Grill</u>, 2011 WL 127891, at *4 (language in the TPP "makes clear

                                    9

that providing the requested documents was simply a part of the application process, which plaintiff was willing to complete in the hope that [the lender] would modify his loan").

Third, plaintiffs cite <u>In re Ossman</u>, Case No. 1:11-bk-16788-MT, 2012 Bankr. LEXIS 326 (C.D. Cal. Jan. 31, 2012), which they did not bring to the attention of the court until immediately before the hearing on this motion was scheduled.  The bankruptcy court <u>In re Ossman</u>, however, relied heavily on <u>Turbeville</u> and <u>Ansanelli</u>.  The three cases from outside this district cited by plaintiffs do not convince the court to deviate from the holdings in <u>Grill</u> and <u>Nadan</u> and create contradictory precedent within the district.

Although neither party cited to it in their briefing, a Seventh Circuit case, decided less than a month before briefing was completed, also addresses the question whether TPPs are valid contracts that a lender violates if they fail to offer a permanent modification at the close of the four-month trial period.  <u>Wigod v. Wells Fargo Bank, N.A.</u>, --- F.3d ----, No. 11-1423, 2012 WL 727646 (7th Cir. Mar. 7, 2012).  In <u>Wigod</u>, the plaintiff received a TPP that, like plaintiffs', provided that "after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer.  This Plan will not take effect unless and until . . . the Lender provides me with a copy of this Plan with the Lender's signature." <u>Id.</u> at * 7.  The TPP also warned the plaintiff that before she would be given a permanent modification, Wells Fargo had to determine that she qualified

under HAMP guidelines.  *Id.*  Wells Fargo then returned an executed copy of the TPP and sent plaintiff a letter confirming that she was qualified for a modification.  *Id.*

Applying Illinois law, the Seventh Circuit held that, in light of the language in the TPP conditioning permanent modification upon a determination that the plaintiff qualified and receipt of a "fully executed copy of the Modification Agreement," the TPP became a "unilateral offer to modify Wigod's loan conditioned on her compliance with the stated terms of the bargain" once Wells Fargo determined that she was qualified for a modification and returned to her a countersigned copy of the TPP. *Id.* at *7-8.  The court therefore held that a valid offer existed to support the plaintiff's breach of contract claim.  *Id.*

Here, unlike in *Wigod*, plaintiffs have submitted a copy of the TPP signed by them only.  It does not appear that Suntrust returned an executed copy of the TPP or determined that plaintiffs were qualified to receive a permanent modification. Under the logic of *Wigod*, therefore, it does not appear that there was ever a "unilateral offer to modify [plaintiffs'] loan." *Id.* at *7.  Instead, plaintiffs were invited to apply for a loan modification and cautioned that, in order to be considered, they would have to take certain steps.  As suggested by *Wigod*, without an offer for a permanent modification, there was no contract for a permanent modification for defendants to breach.

Plaintiffs have failed as a matter of law to allege facts sufficient to establish that they entered into a contract to permanently modify the terms of their loan.  Therefore, they have not shown a likelihood of success on the merits of their

1  breach of contract claim.

2      B.  <u>Irreparable Harm</u>

3          If the injunction is not granted, plaintiffs face the

4  risk that the Subject Property, which they represent is their

5  primary residence, will be sold.  The loss of property is often

6  considered an irreparable loss because of the unique nature of

7  real property.  <u>Alcaraz v. Wachovia Mortg. FSB</u>, 592 F. Supp. 2d

8  1296, 1301-02 (E.D. Cal. 2009) (noting that the loss of a home is

9  a "serious loss," but denying motion for preliminary injunctive

10 relief); <u>Avila v. Stearns Lending, Inc.</u>, No. Civ.

11 08-0419-AG(CTx), 2008 WL 1378231, at *3 (C.D. Cal. Apr. 7, 2008).

12 Accordingly, plaintiffs have demonstrated the risk of irreparable

13 loss.

14     C.  <u>Balance of Equities</u>

15         "A preliminary injunction is an extraordinary remedy

16 never awarded as of right." <u>Winter</u>, 129 S. Ct. at 376.  "In each

17 case, a court must balance the competing claims of injury and

18 must consider the effect on each party of the granting or

19 withholding of the requested relief." <u>Amoco Prod. Co. v. Vill.</u>

20 <u>of Gambell, Alaska</u>, 480 U.S. 531, 542 (1987).

21         Defendants contend that, if an injunction is granted,

22 they stand to suffer financial hardship because they will incur

23 damages in the form of lost rental value, lost earned interest,

24 and lost profits due to the property's depreciation in the

25 interim.  As a practical matter, defendants will never be able to

26 recover for that loss.  Defendants have not, though, demonstrated

27 that an injunction would damage the Subject Property or otherwise

28 threaten any security interest in the property.  This is less of

a burden than plaintiffs stand to suffer if they lose their home through a foreclosure sale.

Although plaintiffs emphasize the hardship they will bear if they lose their home, there are other factors the court must take into account.  It is a well-established maxim that "he who seeks equity must do equity."  <u>Mfr.'s Fin. Co. v. McKey</u>, 294 U.S. 442, 449 (1935).  Plaintiffs currently owe over $70,000 on their mortgage and for over two years they have been making only modified payments on their loan.  The only bond that they offer to post is one in the form of monthly payments in the amount of $1,088.28, the same amount as the monthly trial payments required under the TPP, which defendant represents is more than one-third less than their regular monthly payments.  (Opp'n to Mot. for Prelim. Inj. at 21:8-9 (Docket No. 17).)

In such a situation, it is not clear that the balance of equities tips in plaintiffs' favor.  Rather, it seems likely that granting plaintiffs' request for a preliminary injunction would allow them to delay, prolonging the period of time that they have been able to retain the property at issue without paying the full obligations due under the loan and preventing defendants from exercising their rights to foreclose on the property.  <u>See</u> <u>Alcaraz</u>, 592 F. Supp. 2d at 1305-06.

D.   <u>Public Interest</u>

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312 (1982).  "The public interest analysis for the issuance of a preliminary injunction requires

1  [the court] to consider 'whether there exists some critical
2  public interest that would be injured by the grant of preliminary
3  relief.'"  Indep. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly,
4  572 F.3d 644, 659 (9th Cir. 2009) (quoting Hybritech Inc. v.
5  Abbott Lab., 849 F.2d 1446, 1458 (Fed. Cir. 1988)), vacated on
6  other grounds, 132 S. Ct. 1204 (2012).

7         Neither party has addressed this factor in any detail.
8  However, the court cannot see that delaying the foreclosure sale
9  of plaintiffs' property would injure a critical public interest.
10 Accordingly, this factor weighs slightly in plaintiffs' favor.
11 See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1138-39 (9th Cir.
12 2009) ("When the reach of an injunction is narrow, limited only
13 to the parties, and has no impact on non-parties, the public
14 interest will be 'at most a neutral factor in the analysis rather
15 than one that favor[s] [granting or] denying the preliminary
16 injunction.'" (quoting Bernhardt v. L.A. Cnty., 339 F.3d 920, 931
17 (9th Cir. 2003)) (alterations in original)).

18        Balancing the relevant factors, especially given
19 plaintiffs' failure to show any probability of success on the
20 merits of their claim, the court finds that plaintiffs are not
21 entitled to a preliminary injunction.

22        IT IS THEREFORE ORDERED that plaintiffs' motion for a
23 preliminary injunction be, and the same hereby is, DENIED.
24 DATED:  April 12, 2012

25
26                                                              
       WILLIAM B. SHUBB
27     UNITED STATES DISTRICT JUDGE
28

                            14